Sadie J. Normoyle (Washington Bar No. 57811)
Western Environmental Law Center
P.O. Box 6087
Beaverton, OR 97007
(971) 285-3632
sadiejn@westernlaw.org

Matthew K. Bishop (Montana Bar No. 9968), *admitted PHV*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org

*Counsel for Plaintiff, Kettle Range Conservation Group*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP, a non-profit organization, | Case No. 2:23-cv-00147-SAB |
| *Plaintiff,* | |
| vs. | FIRST AMENDED COMPLAINT |
| RODNEY SMOLDEN, et al., | |
| *Federal-Defendants.* | |

INTRODUCTION[1]

1. This case challenges the Forest Service's controversial decision to authorize a large-scale logging project in an area deemed essential to the conservation of threatened Canada lynx ("lynx") in Washington's Kettle Range and the lower 48 States.

2. The Bulldog project allows mechanized commercial logging, thinning and fuel treatments, prescribed burning, and related road work on nearly 44,000 acres. The project also allows for the logging of mature and old growth forest stands, including large trees (which was previously prohibited). All of this will occur in the Colville National Forest's Kettle Range which is a "core area" for lynx conservation and one of the few and last-remaining areas still occupied by lynx in the lower 48 States.

3. The Kettle Range is home to large, mature forest stands and considered a "stronghold" for lynx conservation and critical to the species' long-term recovery. Lynx numbers have declined and continue to decline in recent years and the species' range in Washington continues to contract, mainly due to loss of habitat from logging like the Bulldog project, large wildfires, insect outbreaks, and climate change. The Kettle Range, however, still remains essential to recovery efforts given

---

[1] This first amended complaint is being filed under Fed. R. Civ. Pro. 15(a)(2).

its relatively high snowshoe hare densities (the lynx's primary prey) and due to its still intact mature, multi-storied and old mixed conifer forest stands that still provide sufficient horizontal cover needed for foraging and denning. The area is also important for lynx movement and connectivity in the lower 48 States and between lynx in Washington and those in Canada. This is why the Kettle Range was a designated "core area" for lynx recovery by the U.S. Fish and Wildlife Service and why the Confederated Colville Tribes and other partners are currently undertaking a five-year effort to reintroduce additional lynx into the Kettle Range.

4. The Bulldog project as proposed, however, directly undermines the Kettle Range's value for lynx and on-going recovery efforts by displacing lynx from the area and removing important and essential habitat conditions for lynx over the next 40 years, perhaps longer. When combined with other logging projects and large wildfires in the Kettle Range, the Bulldog project makes an already bad situation worse and may eventually lead the extirpation of lynx from this area. This, in turn, would directly undermine lynx recovery efforts in Washington and the lower 48 States.

5. In approving the Bulldog project the Forest Service failed to carefully consider and analyze the direct, indirect, or cumulative effects to lynx or prepare an environmental impact statement ("EIS") as required by the National Environmental

3

Protection Act ("NEPA"). Nor did the Forest Service evaluate and ensure compliance with forest plan components designed to conserve lynx habitat as required by the National Forest Management Act ("NFMA"). The Forest Service and the Fish and Wildlife Service also failed to properly consult on how the Bulldog project may affect lynx as required by Section 7 of the Endangered Species Act ("ESA). Changes were also made the region's lynx analysis units ("LAUs") behind closed doors and in violation of NEPA and the ESA. Such changes were designed to accommodate the Bulldog project and other large logging projects in the Kettle Range.

6. Plaintiff, the Kettle Range Conservation Group – a local organization dedicated to ensuring the ecological integrity of the Kettle Range and the long-term survival and recovery of lynx in the area – are thus compelled to bring this civil action.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331, 16 U.S.C. § 1540(c), and 5 U.S.C. § 704.

8. This Court has the authority to review the Forest Service's and the Fish and Wildlife Service's action(s) and/or inaction(s) complained of herein and grant the relief requested under 16 U.S.C. § 1540(g) and 5 U.S.C. § 706.

9. The Kettle Range Conservation Group has exhausted all available administrative remedies.

10. All requirements for judicial review required by the ESA are satisfied. The Kettle Range Conservation Group sent the Forest Service and the Fish and Wildlife Service a valid 60-day notice of intent to sue letter and an updated letter and only filed this case only after the 60-day notice periods had run.

11. The relief sought is authorized by 28 U.S.C. § 2201, 28 U.S.C. § 2202, 16 U.S.C. § 1540, and 5 U.S.C. § 706.

12. Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e).

13. The Kettle Range Conservation Group has organizational standing. The organization and its members, supporters, and staff satisfy the minimum requirements for Article III standing. There is a present and actual controversy between the Parties.

## PARTIES

14. The KETTLE RANGE CONSERVATION GROUP is a rural, grassroots, non-profit environmental charity formed in 1976 in Republic, Washington. The organization has roughly 500 members and supporters.

15. The Kettle Range Conservation Group's mission is to defend wilderness, protect biodiversity (including habitat for threatened lynx), and restore ecosystems of

the upper Columbia River Basin. The organization's work includes oversight of federal management of the Okanogan and Colville National Forests; promotion of dry and damaged forest restoration; environmental education for citizens, business, and community groups; preservation of wilderness; and protection of fish and wildlife, including lynx. The organization has a long history of working to protect and restore threatened and endangered species across the Columbia River Basin, including lynx.

16. The Kettle Range Conservation Group was a founding board member of the Northeast Washington Forest Coalition, a collaborative organization created in 2002. The collaborative is designed to work with the Forest Service on projects in the Colville Forest that promote ecological forest restoration, aquatic restoration, wildland protection, recreation, and economic stability in the surrounding area. The collaborative has cooperated with the Forest Service on a number of projects and helped the Forest Service receive funding. The collaborative operates by consensus. The Kettle Range Conservation Group was compelled to resign from its board position on the collaborative in April 2022 after the Colville National Forest pressured other board members to remove its representative.

17. The Kettle Range Conservation Group brings this action on behalf of itself, its members, and its supporters.

18. The Kettle Range Conservation Group's staff, members, volunteers, and supporters have Article III standing to pursue this civil action in their own right and their interests in conserving the Kettle Range and habitat for lynx and other wildlife species (at stake in this case) are germane to the organization's purposes.

19. The Kettle Range Conservation Group's members, supporters, and staff are dedicated to ensuring our public lands provide sufficient and protected habitat for wildlife species, including lynx. The organization's members, supporters, and staff are dedicated to ensuring the long-term survival and recovery of lynx in the Kettle Range, Washington, and the lower-48 States. They are also dedicated to ensuring the Forest Service and Fish and Wildlife Service comply with the law and ensure all decisions affecting public lands are well informed and apply the best available science. The organization's members, supporters, and staff understand the importance of taking a hard look at the environmental effects of agency actions as required by NEPA and ensuring full compliance with section 7 of the ESA's consultation provisions.

20. The Kettle Range Conservation Group's members, supporters, and staff live near and/or routinely recreate on public lands in the Kettle Range, including within the project area for the Bulldog project. The organization's members, supporters, and staff enjoy using the area for solitude, hiking, skiing, camping,

backpacking, boating, fishing, and wildlife viewing. They have engaged in these activities in the past in the project area and intend to do so again in the near future.

21. The Kettle Range Conservation Group's members, supporters, and staff gain aesthetic enjoyment from the beauty of the project area for the Bulldog project, including the old-growth and mature forest stands, subalpine meadows, and diverse riparian areas that would be irreparably impacted by the project. The organization's members, supporters, and staff enjoy observing–or attempting to observe–and studying lynx, including signs of lynx presence and/or photographing lynx in areas where the species is known to occur in the Kettle Range and project area. The opportunity to view wildlife, including lynx and signs of lynx in the wild and in the area affected by the Bulldog project, by itself is of significant interest and value to them and increases their use and enjoyment of the action area.

22. The Kettle Range Conservation Groups' members, supporters, and staff derive aesthetic, recreational, scientific, inspirational, educational, spiritual, and other benefits from spending time in the Kettle Range and the project area and seeing (or trying to see) lynx in the wild, and in working to conserve lynx habitat and help recover lynx in the Kettle Range, Washington, and the lower 48 States. In furtherance of these interests, they have worked and continue to work to conserve wildlife habitat in the Kettle Range, including habitat for lynx and its prey species,

snowshoe hare and red squirrel. Ensuring that the Forest Service and the Fish and Wildlife Service comply with the law as alleged in this case when making important decisions to approve projects like the Bulldog project is a key component of these interests.

23. The Forest Service's approval of the Bulldog project and related changes made to LAUs has harmed, is likely to harm, and will continue to harm the Kettle Range Conservation Group's interests protecting and preserving the Kettle Range and habitat for lynx and other wildlife species. The organization's interests have been, are being, and unless the requested relief is granted, will continue to be harmed by the Bulldog project.

24. If this Court issues the relief requested, the harm to the Kettle Range Conservation Group's interests will be alleviated and/or lessened.

25. Federal-Defendant RODNEY SMOLDEN, is sued in his official capacity as Forest Supervisor for the Colville National Forest. As Forest Supervisor, Mr. Smolden is the federal official with responsibility for all Forest Service officials' actions and/or inactions challenged in this case.

26. Federal-Defendant RANDY MOORE, is sued in his official capacity as Chief of the U.S. Forest Service. As Chief, Mr. Moore is the federal official with

responsibility for all Forest Service officials' actions and/or inactions challenged in this case.

27. Federal-Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the United States Department of the Agriculture that is responsible for applying and implementing the federal laws and regulations challenged in this case.

28. Federal-Defendant HUGH MORRISON, is sued in his official capacity as Regional Director for the United States Fish and Wildlife Service's Pacific Region, which includes Washington. As Regional Director, Mr. Thompson is the federal official with responsibility for all Fish and Wildlife Service officials' actions and/or inactions challenged in this case.

29. Federal-Defendant MARTHA WILLIAMS is sued in her official capacity as Director of the United States Fish and Wildlife Service. As Director, Ms. Williams is the federal official with responsibility for all Fish and Wildlife Service officials' actions and/or inactions challenged in this case.

30. Federal-Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("Fish and Wildlife Service") is an agency within the United States Department of the Interior that is responsible for applying and implementing the federal laws and regulations challenged in this case.

BACKGROUND

*Lynx*

31. Lynx are medium-sized cats with long legs and large, well furred paws and webbed toes. Lynx have a lower foot loading and longer limb length (compared to bobcats) with large feet that are specifically adapted to travel through deep, fluffy snow conditions which give the species a competitive advantage over other species.



32. Lynx are habitat specialists that depend on mature, multi-story forest stands with dense horizontal cover. Lynx occur primarily in spruce-fir vegetation types that receive persistent snowfall. Sufficient horizontal cover is an important feature for lynx habitat. Lynx habitat in the West is dominated by stands of mixed conifer, including Engelmann spruce, subalpine fir, and lodgepole pine.



33. Lynx are prey specialists, relying almost exclusively on snowshoe hare. Forest structure that provides dense horizontal cover is a common characteristic of snowshoe hare habitat. Dense horizontal cover provides cover from predators, thermal protection, and adequate forage. In Washington, snowshoe hare habitat typically includes areas with dense, horizontal cover at least 3-10 feet above the ground or snow level.

34. Snowshoe hares are the primary prey for lynx. The percentage of lynx diet composed of snowshoe hare varies by geography across their range. Snowshoe hare comprise between 35-97% of lynx diet in different places throughout the species' range. The summer diet of lynx may include greater diversity of prey species than in winter, due to the greater seasonal availability of prey. Other food sources include

red squirrel, ground squirrels, grouse, mice, porcupine, beaver, voles, weasels, and shrews.

35. Red squirrels are the most important alternate prey for lynx, especially in areas where snowshoe hare densities are low. Red squirrels are an important secondary food source for lynx. Red squirrels are the main alternate prey during periods of low hare abundance. Red squirrels rely on mixed conifer forest habitats, including fir, pine, and spruce. Red squirrels feed, nest and breed in trees. Red squirrels need a large amount of forest to survive. Changes to either the type of tree or the design of the woodland can negatively affect populations of red squirrels.

36. Lynx survival and distribution is influenced by snow conditions. Lynx survival and distribution is generally restricted to areas that receive deep powdery, and persistent snow that allows lynx to outcompete other terrestrial hare predators that are less efficient in such conditions. Lynx are highly adapted to environments that receive considerable winter snow.

37. Lynx and snowshoe hares only persist in areas with long winters and persistent deep snow. Snow depth and the distribution of snowshoe hares are the strongest predictors of where lynx select their home ranges. Lynx are adapted to cold environments. Lynx are sensitive to changes in snow depth. The lynx's adaptations

allow them to occupy habitats that are generally unavailable to other species during the winter months.

38. Lynx natal and maternal den sites are used until kittens reach about 6-8 weeks of age. For denning habitat to be functional, it must be in, or adjacent to, foraging habitat. Common components of natal and maternal den sites are large woody debris (root wads and downed logs) and dense horizontal cover.

39. The average home range for lynx is 5–10 hectares (12–25 acres). Daily movements of lynx within their home ranges are centered on continuous forests. Lynx generally avoid large openings (both natural and created) when moving through their home ranges.

40. The vast majority of the lynx's habitat and range is in Canada and Alaska.

41. Lynx in the lower 48 States are part of a meta-population with a core population located in Canada. A meta-population is a network of semi-isolated subpopulations, each occupying a suitable patch of habitat in a landscape of otherwise unsuitable habitat. Meta-populations require some level of regular or intermittent migration and gene flow among subpopulations, in which individual populations support one another by providing genetic and demographic enrichment through mutual exchange of individuals. Individual subpopulations may go extinct or lose genetic viability, but are then rescued by immigration from other

subpopulations, thus ensuring the persistence of the meta-population.

42. In the lower 48 States, lynx historically occurred in:

(1) the Cascades Range of Washington and Oregon; (2) the Rocky Mountain region

of in Montana, Wyoming, Idaho, eastern Oregon, eastern Washington, northern

Utah, Colorado, and northern New Mexico; (3) the western Great Lakes region; and

(4) the northeastern United States region from Maine southwest to New York.



**Figure 8.17**—Spatial distribution of lynx occurrence data from 1842 to 1998 (Table 8.1).

43. Lynx population numbers in the lower 48 States are naturally lower than

populations in Canada.

44. Lynx in the lower 48 States were subject to exploitation and over-trapping

during the 1960s, 1970s, and 1980s in response to high pelt prices. From the mid-

1970s until the late 1980s, lynx pelts were at record highs in the lower 48 States and Canada. Lynx pelt prices peaked in the mid-1980s at nearly $500 per pelt and remained above $200 per pelt for 12 years until 1989.

45. Lynx experienced significant population declines in the lower 48 States in the 1980s and 1990s. Lynx experienced significant population declines in Washington in the 1970s and 1980s. A number of states, including Washington, prohibited lynx trapping in response to declining population numbers.

*Lynx receive protected status as a threatened species under the ESA*

46. In January 2000, the Fish and Wildlife Service prepared a Lynx Conservation Assessment and Strategy ("2000 Lynx Assessment") to evaluate and inform whether lynx in the lower 48 States should be protected as a threatened species under the ESA.

47. The 2000 Lynx Assessment identified a number of risk factors for lynx. The 2000 Lynx Assessment identified timber and logging projects as a risk factor for lynx. The 2000 Lynx Assessment identified wildland fire as a risk factor for lynx. The 2000 Lynx Assessment identified recreation in areas occupied by lynx as a risk factor for lynx. The 2000 Lynx Assessment identified human development is a risk factor for lynx.

48. The 2000 Lynx Assessment identified a number of factors affecting lynx mortality (trapping, predator control, incidental shooting, highways), lynx movement (highways and private land development), and other large-scale risk factors, including loss of connectivity and habitat fragmentation. The loss of connectivity and habitat fragmentation breaks down meta-population dynamics.

49. In March 2000, the Fish and Wildlife Service listed lynx as a threatened distinct population segment in the lower 48 States under the ESA.

50. The March 2000 listing was premised on the findings included in the 2000 Lynx Assessment.

51. The Fish and Wildlife Service determined that lynx were likely to become endangered in the foreseeable future throughout all, or a significant portion, of its range in the lower 48 States.

52. The Fish and Wildlife Service identified the loss of foraging and denning habitat from logging, fire, and insects (bark beetle, bug worm) as a threat to lynx. The Fish and Wildlife Service identified habitat fragmentation as a threat to lynx. The Fish and Wildlife Service identified mortality from predation, vehicle collisions, trapping (incidental) is a threat to lynx. The Fish and Wildlife Service identified climate change as a threat to lynx.

53. In 2013, the Fish and Wildlife Service's Interagency Lynx Biology team updated and revised the 2000 Lynx Assessment.

54. The 2013 Lynx Assessment recognizes four "first tier" anthropogenic threats to lynx that are "of greatest concern" to the conservation of lynx. These first tier threats include: (1) climate change which is likely to shift the distribution of lynx north, result in changes to snowshoe hare cycles, reduce the amount of available lynx habitat and population size, alter demographic rates, and change predator-prey relationships; (2) vegetation (timber) management; (3) wildland fire management; and (4) habitat fragmentation.

55. The 2013 Lynx Assessment identified "second tier" anthropogenic threats to lynx. These second-tier threats include: (1) incidental trapping and illegal shooting; (2) recreation, including winter recreation and new roads and trails; and (3) energy projects and grazing.

56. In October 2017, the Fish and Wildlife Service released a Species Status Assessment ("2017 Status Assessment") for lynx.

57. The 2017 Status Assessment was prepared by a lynx "core team" and other staff. The 2017 Status Assessment relies on the input and professional opinions provided during an Expert Elicitation Workshop and information contained in the

2013 Lynx Assessment. The 2017 Status Assessment is considered the most up-to-date and best available science on lynx and threats to the species.

58.  In the 2017 Status Assessment, the Fish and Wildlife Service recognized climate change as the most serious threat to lynx conservation and recovery in the lower 48 States. The 2017 Status Assessment states that it expects that "resident population sizes and distributions in the [lower 48 States] will likely decline largely as a result of projected continued climate warming and associated impacts, which are likely to exacerbate the potential adverse effects of other stressors."

59. The 2017 Status Assessment states that while the "timing and extent of climate-mediated impacts are uncertain, continued warming is expected to cause a northward and upslope contraction of the boreal forest, snow conditions, and hare populations that support lynx, along with several other potential impacts." The 2007 Status Assessment states that this in turn will "result in smaller, more fragmented, and more isolated lynx populations [in the lower 48 States] that would be more vulnerable to stochastic demographic and catastrophic events and genetic drift."

60. The 2017 Status Assessment states that climate change has and continues to adversely impact lynx in the lower 48 States, including Washington. The 2017 Status Assessment states that climate warming has and will continue to reduce snow amount, duration and quality (conditions favorable to lynx) and will likely result in

increased size, frequency, and severity of wildfires and insect outbreaks in lynx habitat. Climate change may also cause changes in snowshoe hare population cycles and disrupt connectivity between subpopulations in the lower 48 States, and between lynx in Canada and the lower 48 States. Climate change has increased the size, frequency, and severity of wildfires in lynx habitat.

*"Core areas" for lynx recovery in the lower 48 States*

61. In 2005, the Fish and Wildlife Service prepared a recovery outline for lynx.  The lynx recovery outline guides all recovery efforts for the Fish and Wildlife Service until a final recovery plan for lynx is prepared.

62. The Fish and Wildlife Service has yet to prepare a final recovery plan for lynx. The recovery outline is and remains the agency's vision for conserving the species in the lower 48 States in the face of various threats.

63. The Fish and Wildlife Service said the recovery outline presents its understanding of historical and current lynx distribution, ecology, population dynamics, and the relative importance of different geographic areas to the persistence of lynx in the lower 48 States.

64. In the lynx recovery outline, the Fish and Wildlife Service identified six "core areas" for lynx recovery in the lower 48 States. "Core areas" for recovery are areas that have: (1) verified evidence of long-term historical and current presence of

20

lynx populations; (2) recent (within the past 20 years) evidence of reproduction; (3) contain boreal forest vegetation types of sufficient quality and quantity to support lynx and snowshoe hares; and (4) snow conditions that are generally fluffy and/or deep enough to favor the lynx's competitive advantage.

65. The "core areas" for lynx recovery include: (1) Northern Maine and New Hampshire; (2) Northeastern Minnesota; (3) Northwestern Montana and Northeastern Idaho; (4) Washington's Kettle Range/Wedge; (5) North Cascades; and (6) Greater Yellowstone Areas.



66. The Fish and Wildlife Service outlined four recovery objectives for lynx in these six core areas: (1) retain adequate habitat of sufficient quality to support long-term persistence of lynx populations in identified "core" areas; (2) ensure sufficient habitat is available to accommodate long-term persistent of movement between each core area and adjacent populations in Canada or secondary areas; (3) ensure that habitat in secondary areas remains available for lynx occupancy; and (4) ensure that all threats are addressed so that lynx will persist in the contiguous United States "for at least the next 100 years."

67. The Fish and Wildlife Service outlined seven specific actions (several with multiple parts) needed to achieve the four recovery objectives in the six "core areas". These actions include: (1) establishing management commitments in all core areas; (2) maintaining baseline inventories of lynx habitat in each core area; (3) monitoring lynx use in core areas; (4) identifying habitat to facilitate movement between core areas; (5) ensuring that habitat in all secondary areas remain available for lynx; (6) identifying population and habitat limiting factors for lynx; and (7) developing a post-delisting monitoring plan for lynx.

*Washington's "core areas" for lynx recovery*

68.  Washington is part of the lynx's historic range. Washington is occupied by a number of lynx subpopulations.

22

69. Verified records of lynx in Washington, including reproduction, are numerous and well-distributed since the late 1800s. According to trapping records, trappers regularly took a dozen or more lynx from remote areas in north-central and northeastern Washington each year in the 1940s.

70. Trapping for lynx in Washington was prohibited in 1991 due to declining numbers. Lynx are sometimes caught in traps set for other species, including bobcats. Trapping in southern British Columbia, Canada is limiting the immigration and movement of lynx from Canada into Washington.

71. In 1993, Washington Department of Fish and Wildlife ("WDFW") published a report entitled Status of the North American Lynx (*Lynx Canadensis*) in Washington. In the 1993 lynx report, WDFW estimated the state's lynx population to be between 96-191 individuals. In the 1993 report, WDFW explained that the current range of lynx in Washington was largely limited to six areas: the Okanogan, Vulcan Mountain, Kettle Range, Wedge, Little-Pend Oreille, and Salmo-priest regions in north-central and northeastern Washington.

72. In the 1993 report, WDFW raised concerns about the loss of lynx numbers and habitat due to past logging and habitat alternations and past trapping pressure on the species. WDFW's trapping records reveal at least 215 lynx were trapped in killed in Washington between 1960 and 1991.

73. In 1993, Washington listed lynx as a "threatened" species under state law.

74. In 2001, WDFW prepared a final report and state recovery plan for lynx in Washington.

75. The 2001 state lynx recovery plan for Washington includes maps of all lynx analysis units ("LAUs") in Washington. A LAU is the approximate size of a female's home range. WDFW says it uses LAUs to report survey data and to analyze the condition of lynx habitat.



Lynx occurrence by Lynx Analysis Unit
*(Source: Washington Department of Fish and Wildlife)*

76. In 2006, the Washington State Department of Natural Resources ("DNR") published a Lynx Habitat Management Plan for all DNR managed lands in Washington. Washington DNR manages more than 5 million acres of state land in

Washington. The 2006 Lynx Habitat Management Plan replaces Washington DNR's previous, 1996 plan. Washington DNR manages roughly 4 percent of the lynx habitat in Washington.

77. In 2006, WDFW published a paper entitled *Lynx in the State of Washington* which included a map depicting recent lynx occurrence in Washington by LAU and region.

78. In 2016, WDFW published a status review of lynx in Washington. Due to the amount of range contraction for lynx in Washington, the loss of lynx habitat in Washington (due to fires and logging), and ongoing threats from climate change, WDFW recommended uplisting lynx from "threatened" to "endangered" status under state law.

79. In 2016, Washington uplisted lynx from "threatened" to "endangered" state status.

80. Washington is divided into six lynx management zones based on historic lynx data and habitat. The six lynx management zones in Washington include: (1) Okanogan; (2) Vulcan-Truck; (3) Kettle Range; (4) the Wedge; (5) Little Pend Oreille; and (6) Salmo-Priest.



Figure 2. Lynx management zones (LMZs) in Washington indicate the general areas historically occupied by lynx in northcentral and northeastern Washington.

### The Kettle Range management zone and "core area" for lynx recovery

81. WDFW designated the Kettle Range a lynx management zone. The Fish and Wildlife Service designated the Kettle Range a "core area" for lynx recovery.

82. The Kettle Range is the southernmost range of the Monashee Mountains, located in far southeastern British Columbia, Canada, and northeastern Washington. The Kettle Range provides contiguous habitat between Washington and British Columbia.



83. The Kettle Range forms the eastern and southern boundary for Ferry County, Washington. Most of the northern half of the Kettle Range is located on Colville National Forest and managed by the Forest Service. The southern half of the Kettle Range is located on the Colville Indian Reservation and managed by the Confederated Tribes of the Colville Reservation.

84. The Kettle Range is occupied by wolverine. The Kettle Range is occupied by gray wolves. The Kettle Range used to be occupied by caribou. The Kettle Range is occasionally occupied by grizzly bears.

85. The Kettle Range is occupied by lynx.

86. There is evidence of lynx reproduction in the Kettle Range. Lynx were routinely trapped and killed in the Kettle Range.

87. The Kettle Range was considered a stronghold for lynx. The Kettle Range contains good lynx habitat. The Kettle Range includes boreal forest landscapes with sufficient snowshoe hare densities and winter snow which make it ideal for lynx. There are large expanses of subalpine fir forests in the Kettle Range.

88. The forests in the Kettle Range are primarily Northern Rocky Mountain mixed conifer. The forests in the Kettle Range were historically comprised of mature, dense stands of mixed conifers with sufficient horizontal cover which are ideal for lynx. Historically, forest stands in the Kettle Range were not open and widely spaced dry forest stands. This picture was taken from the Jackknife Mountain lookout in September, 1934 in the Kettle Range:



89. Forest stands in the Kettle Range experience winter conditions with deep snow for extended periods of time. Forest stands in the Kettle Range include sites for denning such as downed trees and root wads. The Kettle Range includes matrix habitat allowing lynx to travel between patches of boreal forest.

90. From 1981 to 1988, WDFW tracked 30 lynx with radio-telemetry in north-central Washington, including in the Kettle Range. Three of the tracked lynx gave birth to kittens in the Kettle Range.

91. WDFW determined the Kettle Range contains the second-largest block of lynx habitat in Washington. Between 400 and 987 square kilometers of suitable lynx habitat is present in the Kettle Range. WDFW estimates the Kettle Range is capable of supporting a population of roughly 23 lynx.

92. Biologists estimate the Kettle Range contains relatively high densities of snowshoe hares, approximately 0.6-3.6 hares/hectare. According to WDFW "habitat conditions in the Kettle Range appear adequate to support lynx as demonstrated by estimates of relatively high hare densities (0.6-3.6 hares/ha)."

93. WDFW determined the Kettle Range contains quality habitat essential to lynx conservation. WDFW recommended the Kettle Range be included in designated lynx critical habitat.

94. Historically, the Kettle Range is responsible for the highest levels of lynx take in Washington. Lynx were once considered numerous in the Kettle Range.

95. During the peak of 1969, 26 of the 31 lynx trapped and killed in Washington were from the Kettle Range in Ferry County. In 1975, 14 of 19 lynx taken in Washington came from the Kettle Range. In 1976, 17 of 39 taken in Washington came from the Kettle Range.

96. In a 1993 report, WDFW reported that the Kettle Range was responsible for the highest lynx take in Washington. During one trapping season in the mid-1970s, two local trappers reported taking 35 lynx in the Kettle Range alone.

97. Approximately thirty-five percent of all lynx trapping records from Washington – 82 individual lynx – are from the Kettle Range. The neighboring Okanogan Range to the west of the Kettle Range accounted for twenty-percent of all lynx trapping records and neighboring Stevens county to the east of the Kettle Range accounted for ten percent of lynx trapping records.

98. Lynx were considered to be present and reproducing in the Kettle Mountains well into the 1970s but biologists surmise the local population was likely over-trapped. A trapper from Ferry County stated that he trapped and killed 23 lynx in a single year in the Kettle Range during his best year in the mid-1970s.

99. The location of the Kettle Range is important for lynx because it provides connectivity between lynx in the lower 48 States and lynx in Canada. The Kettle Range provides connectivity between sub-populations of lynx in the lower 48 States. The Kettle Range is an important linkage area for lynx. Lynx frequently travel through the Kettle Range as they travel to/from British Columbia and across the international boundary with Canada.

100. Modeling for lynx habitat connectivity in Washington identified viable connectivity between the North Cascades, the Kettle Range and the Wedge, and the Northern Rocky Mountains and Canada.

101. The Kettle Range is designated as occupied lynx habitat by the Forest Service.

102. In 2000, the Kettle Range contained the second largest block of lynx habitat in Washington. In 2000, the Kettle Range was considered a "stronghold for lynx" in Washington. In 2000, the Kettle Range supported a resident, breeding population of lynx.

103. In 2001, WDFW prepared a recovery plan for lynx in Washington. In the 2001 recovery plan, WDFW mapped all LAUs in the Kettle Range.

104. WDFW's 2001 lynx recovery plan documents evidence of lynx occupancy in the Kettle Range. Based on verified data collected from annual lynx

surveys which included snow tracking, automated camera sets, and hair snares conducted in six "lynx management zones" – including the Kettle Range – WDFW noted that it routinely documented lynx presence in the Kettle Range. This includes confirmed lynx tracks in the Kettle Range in 1989, 1990, 1991, 1994, 1997 and 2000, as well as "other unconfirmed, but considered highly likely report of lynx in the Kettle Range" from 1996, 1997 and 2000.

105. In 2001, WDFW considered at least a third of the Kettle Range occupied by lynx. The state wildlife agency estimated that approximately 8 to 12 lynx likely inhabit the Kettle Range. WDFW noted that lynx likely have not recovered from the intense trapping periods of the 1970s and 1980s and that they could "find only a couple of records suggesting lynx kitten production in the Kettle Range in 2000.

106. WDFW noted that a knowledgeable local trapper (Bert Edwards) tracked a juvenile lynx in 1993 suggesting that reproduction may have occurred in the Kettle Range at that time. WDFW explained that snow-tracking routes in the Kettle Range are not sampled annually and any particular segment of the route may only be sampled every 3 years. WDFW noted that the survey routes do not traverse the highest lynx habitat in the Kettle Range, so if lynx are present they may not be detected.

107. In 2005, the Fish and Wildlife Service designated the Kettle Range as a "core area" for lynx recovery in the lower 48 States.

108. The Fish and Wildlife Service designated the Kettle Range as a "core area" due to its available lynx habitat, snowshoe hare densities, and the verified presence of lynx in the area. "Core areas" are areas with the strongest long-term evidence of persistence of lynx populations within the lower 48 States.

109. In 2006, Dr. Keith Aubry, PhD Wildlife Biologist submitted comments to the Fish and Wildlife Service recommending the Kettle Range be included in a proposed rule designating critical habitat for lynx in the lower 48 States.

110. Dr. Aubry explained that the Kettle Range includes large expanses of subalpine fir forests and a very strong historical record of lynx occurrence. Dr. Aubry explained that protecting habitat for lynx in the Kettle Range would be particularly important for the conservation of the species in the lower 48 States. Dr. Aubry explained that the Kettle Range is located about midway between extant resident populations in the northern Cascade Range in Washington and the northern Rocky Mountains in Idaho and Montana and provides important habitat connectivity between these populations.

111. In 2007, WDFW updated its lynx surveys based on additional lynx detections throughout the State. Based on the historic records, track surveys, and the

additional detections, WDFW said it was confident the Kettle Range is "occupied" by lynx. WDFW said that while detections of lynx have been limited and sporadic in the Kettle Range, it continued to receive sporadic detections of lynx in the Kettle Range, including in 2007.

112. WDFW stated that while the Fish and Wildlife Service notes that snow-tracking surveys from 1992-1996 resulted in only 2 lynx detections, the state agency has received 26 records of lynx in the Kettle Range between 1990 and 2007. WDFW said most of these detections were made by knowledgeable individuals including Bert Edwards, who trapped the area for over 40 years and caught many of the lynx in the Kettle Range in the 1970s.

113. In 2008, WDFW "strongly" recommended that the Kettle Range be designated lynx critical habitat. WDFW said it considers the Kettle Range to be "occupied" by lynx and routinely receives detections of lynx in the area.

114. In 2008, WDFW said present habitat conditions in the Kettle Range are adequate to support lynx as demonstrated by estimates of relatively high hare densities (0.6-3.6 hares/ha) in younger forest stands that have regenerated from both timber harvest and wildfires.

115. In 2008, WDFW said it was aware of a fence at the northern end of the Kettle Range in British Columbia, Canada that was installed to prevent vehicle

collisions with bighorn sheep and deer in a major highway corridor. WDFW said this fence may create an obstacle for lynx dispersal and re-colonization in the Kettle Range.

116. WDFW said it considers the Kettle Range to be "essential to the conservation of lynx."

117. In 2008, Gary Koehler, wildlife biologist and researcher, recommended the Kettle Range be designated as critical habitat for lynx. Koehler said sufficient habitat exists in the Kettle Range to support lynx. Koehler said that climate change and the increase in wildfires places greater importance on the Kettle Range for the conservation of lynx. Koehler said the ensuring lynx remain in the Kettle Range will help ensure "redundancy" of lynx populations in Washington and the lower 48 States which is needed for long-term viability and conservation.

118. In 2008, Koehler published a paper entitled *Habitat Fragmentation and Persistence of Lynx Populations in Washington State* ("Koehler (2008)"). Koehler (2008) mapped suitable lynx habitat in the Kettle Range. Koehler (2008) mapped the extent of lynx habitat composed on Engelmann spruce and subalpine fir forests with canopy cover from 11-39 percent and elevations ranging from 1,525 meters to 1,828 meters in the Kettle Range. Koehler (2008) estimated that the Kettle Range could

support 10-23 lynx. Koehler (2008) recommended conducting a feasibility study to explore reintroducing lynx to the Kettle Range.

119. In 2014, the Fish and Wildlife Service agreed that the Kettle Range was historically occupied by lynx and that lynx still inhabited the range.

120. In 2014, WDFW recommended the Fish and Wildlife Service once again consider designating the Kettle Range as lynx critical habitat. WDFW said the Kettle Range is important for lynx in the lower 48 States because it supports movement between larger areas of habitat in the Cascades and Selkirks. WDFW said that a reproducing population lynx may be reestablished in the Kettle Range either through immigration (most likely from Canada) or through reintroduction.

121.  A 2019 habitat feasibility study identified the Kettle Range as an important area for lynx recovery efforts, in part, because it is geographically connected to lynx populations in Canada.

122. In 2020, King et al. published a paper entitled *Will Lynx Lose Their Edge? Canada Lynx Occupancy in Washington* ("King (2020)"). King (2020) documented the presence of lynx in the Kettle Range based on camera stations that were placed in the range during the summers of 2016 and 2017.



123. King (2020) determined that lynx in Washington may be particularly vulnerable to climate change.

124. King (2020) determined that maintaining the greatest quantities of lynx habitat at high elevations in places where favorable snow conditions may persist like the Kettle Range is important for lynx resilience.

125. King (2020) documented the importance of maintaining connectivity between lynx populations in Canada and those in Washington, including the Kettle Range.

*Declines in lynx numbers and range in the lower 48 States, Washington, and the Kettle Range "core area" since listing*

126. Lynx populations in the lower 48 States have declined since listing in 2000. Lynx populations in Washington have declined since 2000. Lynx populations in the Kettle Range "core area" have declined since 2000.

127. The lynx's range has contracted in the lower 48 States since 2000. The amount of available lynx habitat in the lower 48 States has declined since 2000. The lynx's range and available habitat has declined in Washington since 2000. The lynx range and available habitat has declined in the Kettle Range "core area" since 2000.

128. Lynx numbers and range has declined in Washington since 2000 due to logging. Lynx numbers and range in Washington has declined since 2000 due to insect outbreaks. Lynx numbers and range in Washington has declined since 2000 due to forest fires. Lynx numbers and range in Washington has declined since 2000 due to climate change.

129. Wildfires in Washington have resulted in a decrease in lynx populations since 2000. Wildfires in Washington have decreased available lynx habitat in Washington since 2000. All six lynx management zones in Washington occur in fire-prone landscapes.

130. Since the 1980s, there has been a significant increase in large-wildfire frequency in the six lynx management zones. Wildfires can lead to a loss and

degradation of forest cover. Wildfires can lead to a loss of snowshoe hare populations. Lynx habitat likely does not recovery from wildfires in Washington for roughly 35-40 years.

131. By 2017, the loss of lynx habitat in Washington due to forest fires reduced estimates of available lynx habitat to 3,800 sq. km.

132. By 2017, it was estimated that Washington's lynx habitat could only support approximately 38-61 lynx.

133. In 2020, it was estimated that only the Okanogan lynx management zone in Washington likely supported a resident, reproducing population of lynx.

134. The Vulcan-Trunk lynx management zone in Washington may no longer support a resident, reproducing population of lynx (just individuals). Recent (2016 and 2017) surveys for lynx in the Vulcan-Trunk lynx management zone failed to detect any lynx presence.

135. The Wedge lynx management zone in Washington may no longer support a resident, reproducing population of lynx (just individuals). Recent (2016 and 2017) surveys for lynx in the Wedge lynx management zone failed to detect any lynx presence.

136. The Little Pend Oreille lynx management zone in Washington may no longer support a resident, reproducing population of lynx (just individuals).

137. The Salmo-Priest lynx management zone in Washington may no longer support a resident, reproducing population of lynx.

138. There is a lack of lynx population redundancy in Washington. Future forecasts reveal there is a strong potential for retraction of suitable lynx habitat in Washington.

139. The 2017 Species Assessment acknowledged that since listing, lynx have likely been significantly reduced in size in Washington. Since listing, lynx have been extirpated in large portions of Washington. Since listing, lynx populations have been reduced in size in Washington. Since listing, lynx habitat has been reduced in size in Washington.

140. The Fish and Wildlife Service does not have current information on lynx distribution in Washington. The Fish and Wildlife Service does not have current information on lynx population status in Washington.

141. Lynx in Washington are currently at risk of extirpation. Lynx in Washington are likely to become endangered in the foreseeable future.

142. Lynx presence has declined in the Kettle Range core area and management zone for lynx, but lynx still remain in the region.

143. Lynx presence has declined in the Kettle Range "core" recovery area since 2000. The Kettle Range may no longer be a "stronghold" for lynx. It is

uncertain whether Kettle Range still supports a resident, breeding population of lynx (or just individuals).

144. A camera trap survey from 2016-2017 documented three photos of a lynx in the Kettle Range.

145. In 2018, a camera trapping effort was launched in the Kettle Range. This effort detected at least one lynx in the area.

146. During the winter of 2020, lynx tracks were reported in the Kettle Range and later confirmed by Forest Service and Washington DNR biologists. In 2020 lynx tracks were observed in the Bulldog project area.

147. In 2020, a lynx was captured on a trail camera in the Kettle Range on the Thirteen Mile trails, roughly 8 miles west of White Mountain.



148. There are on-going efforts to recover and reintroduce additional lynx to the Kettle Range.

149. The Confederated Tribes of the Colville Reservation, including the Confederated Tribe's Fish and Wildlife Department, in partnership with Conservation Northwest, Upper Columbia United Tribes, the Okanagan Nation Alliance, and others have been capturing lynx in Canada and relocating them to the Colville Indian Reservation in the Kettle Mountains.





150. The goal of the reintroduction effort is to help reestablish a stable and reproductive population of lynx within the entire Kettle Range. The plan is to trap and relocate up to 50 lynx from Canada into the Kettle Range over the next five years, until 2026.

151. By February, 2022, nine adult lynx were released into the Kettle Range.

152. In November, 2022 an additional ten lynx were released into the Kettle Range. At least one of the female lynx reintroduced into the Kettle Range reproduced and has been documented with a kitten.

153. The Confederated Tribe of the Colville Reservation's Fish and Wildlife Department is continuing to monitor lynx occupancy in the Kettle Range, including possible evidence of reproduction.

*The Colville forest plan*

154.  The Kettle Range is located entirely within the Colville National Forest.

155. The Colville National Forest Land and Resource Management Plan ("forest plan") was adopted in 1988.

156. In 1992, a scientific panel was formed to initiate a review and evaluate the ecological health of eastside forests in Washington and Oregon. The "Eastside Forests Scientific Society Panel's" mandate was to review the status of all eastside forests and their associated resources.

157. In 1994, the Eastside Forests Scientific Panel produced a paper known as the "Eastside Screens Report" which documented serious concerns about the loss of late-successional and old-growth forest ecosystems in eastside National Forests, including the Colville National Forest.

158. The Eastside Screens Report defined the current conditions of the Colville National Forest (and other eastside forests) and offered interim recommendations for protecting the resources remaining on the forest until a long-term plan for protection and restoration can be found.

159. The 1994 Eastside Screens Report recommended a "time out" of all logging of late-successional and old-growth forests in eastern Oregon and

Washington, including within the Colville National Forest due to the degraded condition of such ecosystems due to "past logging and road construction."

160. The 1994 Eastside Screens Report noted how essential it is to conserve "as many mature trees" in eastside forests as possible and, in response, recommended against the cutting of any species of tree older than 150 years or with a diameter at breast height ("dbh") of 20 inches or greater. The Report recommended ten other measures be implemented to protect mature and late-successional/old-growth forests and their biological resources.

161. In May, 1994 the Colville forest plan was amended to adopt new standards to protect mature and old forests in response to the Eastside Screens Report. These new forest plan standards were commonly referred to as the "Eastside Screens."

162. The Colvill forest plan's Eastside Screens included six items: three general standards (items 1-3), a riparian standard (item 4), an ecosystem standard (item 5), and a wildlife standard (item 6).

163. The Colville forest plan's Eastside Screens included certain restrictions and prohibitions on logging in forest standards in a late or old structural stage. The Eastside Screens prohibited the logging of all late and old live trees greater than or equal to 21 inches dbh (this prohibition is referred to as the "21 inch rule").

164. The Eastside Screens benefitted species that use and rely on mature, old, and late forest stands and habitat on the Colville National Forest.

165. The Eastside Screens benefitted lynx and snowshoe hare. The 21-inch rule benefited lynx and snowshoe hare.

166. The Eastside Screens and 21-inch rule helped retain mature and late-successional forests with dense horizontal cover. The Eastside Screens and 21-inch rule helped protect horizontal cover for snowshoe hare and lynx.

167. The Colville forest plan was revised in 2019.

168. The 2019 revised Colville forest plan eliminated the Eastside Screens.

169. The 2019 revised Colville forest plan eliminated the 21-inch rule.

170. The 2019 revised Colville forest plan includes forest plan components for lynx in the Kettle Range.

171. The 2019 revised forest plan's components for lynx only apply in LAUs. There are no forest plan components for lynx in the Colville National Forest or Kettle Range outside of the LAUs.

172. The 2019 revised forest plan designates the Kettle Range as occupied lynx habitat. The 2019 revised forest plan states the Kettle Range is a lynx "core area" that "is important for the recovery of Canada lynx in Washington." The 2019

revised forest plan states that the Kettle Range core area is an area with the strongest

long-term evidence of lynx persistence over time within the lower 48 States.

173. The Forest Service designated LAUs in the Kettle Range and

neighboring Wedge area in accordance with the 2013 Lynx Assessment.

174. The 2019 revised forest plan states that habitat conditions for lynx will

be assessed at the LAU scale. There are 14 LAUs in the Kettle Range "core area."



175.  LAUs are used by the Forest Service to assess the effects on lynx and their habitat. LAUs are used to analyze direct effects to lynx. LAUs are used to analyze indirect effects to lynx. LAUs are used to analyze cumulative effects to lynx.

176. Forest plan components for lynx are premised on the location, size, and habitat conditions within LAUs.

177. The forest plan states that LAU boundaries in the Kettle Range can be adjusted based on scientific literature and coordination with Fish and Wildlife Service. The 2013 Lynx Assessment states that LAUs are not to be adjusted for individual projects and must remain constant to be effective for their intended purposes of planning and monitoring.

178. In 2020, the Forest Service decided to change the LAU boundaries in the Colville National Forest and Kettle Range.

179. In 2020, the Forest Service contemplated removing all LAUs from the Wedge lynx recovery zone. The Forest Service decided against removing LAUs from the Wedge recovery zone due to feedback from the "Western Lynx Biology team" which explained the importance of the area for landscape connectivity between the Kettle Mountains and habitat in Canada.

180. In 2020, the Forest Service removed all LAUs from the Okanogan Highlands peripheral area for lynx. Previously, there were three LAUs in the Okanogan Highlands peripheral area, totaling 30,829 acres.

181. In 2020, the Forest Service removed all LAUs from the Selkirk Mountains Secondary Area for lynx. Previously, there were 22 LAUs in the Selkirk Mountains Secondary Area for lynx, totaling 351,734 acres.

182. In 2020, the Forest Service made changes to the LAUs boundaries in the Kettle Range, including the "core area" for lynx recovery. Previously, there were 14 LAUs in the Kettle Range core area for lynx, totaling 218,125 acres. After the change in 2020, there are now only nine LAUs in the Kettle Range core area, totaling 193,649 acres. Roughly 24,476 acres were removed from LAUs in the Kettle Range core area for lynx recovery.

183. In 2020, the Forest Service removed and combined some LAUs from the Kettle Range.

184. In 2020, the Forest Service combined the Indian LAU with the U.S. LAU. The Indian LAU previously included 15,560 acres. The U.S. LAU (before the change) included 16,237 acres. The single combined U.S. LAU after the 2020 changes includes 26,518 acres. Roughly 5,279 acres were removed from the LAU(s) due to this change.

185. In 2020, the Forest Service combined the North Kettle and East Deer LAUs in the Kettle Range. The North Kettle LAU previously included 15,979 acres. The East Deer LAU (before the change) included 8,231 acres. The single combined East Deer LAU now contains 17,227 acres. Roughly 6,983 acres were removed from the LAU(s) due to this change.

186. In 2020, the Forest Service combined the Long Alec and North Boulder LAUs in the Kettle Range. The Long Alec LAU previously included 15,066 acres. The North Boulder LAU (before the change) included 13,672 acres. The single combined North Boulder LAU now contains 20,063 acres. Roughly 8,675 acres were removed from the LAU(s) due to this change.

187. In 2020, the Forest Service removed 20,937 acres from LAUs in the Kettle Range.

188. The 2020 changes to the LAU boundaries in the Colville National Forest and Kettle Range were never subject to NEPA or a public process. The 2020 changes to the LAU boundaries in the Kettle Range were never subject to consultation under Section 7 of the ESA.

*The Bulldog project*

189. On April 28, 2022, the Forest Service authorized the Bulldog logging project in the Kettle Range "core area" for lynx recovery. The Bulldog project includes large-scale commercial and non-commercial logging and related road work.

190. The Bulldog project is located on the Colville National Forest, about 15 miles north and west of Kettle Falls, Washington in Ferry County.



191. The project area for the Bulldog project is roughly 44,000 acres in size. The project area is located on the Three Rivers Ranger District of the Colville National Forest.

192. The Forest Service put the Bulldog project out for scoping in 2018.

193. The Forest Service prepared an environmental assessment ("EA") for the Bulldog project.

51

194. A draft EA was submitted for public review and comment in August, 2020. A final EA was issued in December, 2021.

195. The Bulldog project area contains boreal forest landscapes with sufficient snowshoe hare densities and winter snow.

196. The Bulldog project area includes subalpine fir forests. The Bulldog project area is primarily a Northern Rocky Mountain mixed conifer forest. The Bulldog project area includes mature, multi-storied forest with dense horizontal cover.

197. Forest stands in the Bulldog project area experience winter conditions with deep snow for extended periods of time, include sites for denning such as downed trees and root wads. Forest stands in the project area include matrix habitat allowing lynx to travel between patches of boreal forest.

198. The Bulldog project area is located within occupied lynx habitat. Lynx have been documented in the project area. The project area is located within the Kettle Range "core area" for lynx recovery.

199. The EA cites and references the 2013 Lynx Assessment. The EA considers the 2013 Lynx Assessment to be the best available science on lynx, lynx habitat, and threats to the species.

200. The final EA does not cite or reference the best available science on lynx and threats to lynx in Washington or the Kettle Range.

201. The EA does not cite or reference the 2017 Species Status Assessment. The Fish and Wildlife Service considers the 2017 Species Status Assessment to be the best available science on lynx, lynx habitat, and threats to the species. The 2017 Species Status Assessment is the best available science on lynx, lynx habitat, and threats to the species.

202. The Bulldog project is located within LAUs. Prior to the 2020 changes to the LAU boundaries, the Bulldog project was located in multiple LAUs. Prior to the 2020 changes to the LAU boundaries, the Bulldog project was located in the Indian LAU and U.S. LAU (depicted in blue dotted area below).



203. After the 2020 changes to the LAU boundaries, the Bulldog project is now located only in the U.S. LAU (which was combined with the Indian LAU).



204. The Forest Service removed roughly 5,000 acres from the LAUs when it combined the Indian LAU and U.S. LAU in 2020.

205. The Forest Service removed a large number of logging units for the Bulldog project from the LAU(s) when it made changes to the LAU boundaries and combined the two LAUs.

206. The Forest service removed logging units with mature, late-successional and old-growth forest stands when it made changes to the LAU boundaries and combined LAUs in the Kettle Range.

207. The Forest Service removed the following logging units for the Bulldog project from the LAU(s) when it made changes to the LAU boundaries: 18, 19, 20, 21, 22, 23, 26, 29, 30, 36, 54, 55, 56, 59, 62, 75, 77, 89, 90, 103, 105, 108, 109, 169, 170, 172, 810, 811, 812, 830, 838, 849, 920, 921, 922, 944, 948. These logging units were previously in the LAU(s) prior to the 2020 changes to the LAU boundaries.

208. The Forest Service partially removed portions of the following logging units for the Bulldog project from the LAU(s) when it made changes to the LAU boundaries: 15, 16, 17, 25, 27, 34, 35, 37, 38, 50, 51, 71, 76, 79, 80, 84, 99, 115, 123, 125, 171, 829, 832, 833, 834, 844, 923, 945, 951, 954, 962, 963, 972. Portions of these logging units were previously in the LAU(s) prior to the 2020 changes to the LAU boundaries.

209. The Forest Service does not manage areas outside LAUs for lynx or lynx habitat. The Forest Service changed the LAU boundaries to bring the Bulldog project into compliance with forest plan components for lynx. The Forest Service changed the LAU boundaries to allow logging for the Bulldog project. The Forest Service changed the LAU boundaries to avoid an analysis to lynx or lynx habitat in areas no longer within an LAU.

210. The Forest Service changed the LAU boundaries without any NEPA review. The Forest Service changed the LAU boundaries without any public review or comment. The Forest Service changed the LAU boundaries without consulting with the Fish and Wildlife Service. The change to the LAU boundaries removed mature forest stands from the LAU. The change to the LAU boundaries removed lynx habitat from the LAU. The Bulldog project would not comply with forest plan components for lynx absent the changes made to the LAU boundaries.

211. The new U.S. LAU is 26,518 acres in size. Roughly 5 percent of the U.S. LAU is considered "non-lynx habitat." Roughly 95 percent of the U.S. LAU is considered lynx habitat or habitat capable of supporting lynx. The project area for the Bulldog project extends beyond the U.S. LAU. Logging for the Bulldog project extends beyond the U.S. LAU. Portions of the project area located outside the U.S. LAU are designated occupied lynx habitat. Portions of the project area located outside the U.S. LAU are within the "core" lynx recovery area in the Kettle Range. Lynx have been documented in portions of the project area located outside the U.S. LAU.

212. The draft EA for the Bulldog project does not disclose changes made to LAUs in the Bulldog project area. The final EA does not disclose changes made to LAUs in the Bulldog project area. The final EA does not analyze or explain why

changes were made to LAUs in the Bulldog project area. The final EA does not explain what the changes to the LAUs were in the project area.

213. In August, 2021, the Bulldog Mountain fire burned 5,490 acres.

214. The Bulldog fire burned the eastern portion of the 44,000 acre Bulldog project area. The Forest Service has not prepared a report or otherwise documented and informed the public what changes it made to the project in response to the Bulldog Mountain fire. The Bulldog Mountain fire alleviated the need for vegetative and fuel treatments in the burned area.

215. The Bulldog Mountain fire altered the amount of available lynx habitat in the U.S. LAU. The Bulldog Mountain fire altered the amount of available lynx habitat in the Indian LAU. The Bulldog Mountain fire burned lynx habitat. The Bulldog Mountain fire harmed lynx. The Bulldog Mountain fire damaged lynx habitat. The Bulldog Mountain fire damaged lynx foraging habitat. The Bulldog Mountain fire damaged lynx denning habitat. The Bulldog Mountain fire displaced lynx from the Kettle Range. The Bulldog Mountain fire created unsuitable habitat for lynx.

216. Since 2000, there have been other large wildfires in the Kettle Range that have also created unsuitable habitat for lynx. The Renner fire burned in lynx habitat in the Kettle Range and project area for the Bulldog project in 2015. The

Graves Mountain fire burned in lynx habitat in the Kettle Range. The Togo

Mountain fire burned in lynx habitat in the Kettle Range. The Copper Butte fire

burned in lynx habitat in the Kettle Range. The Mt. Leona fire burned in lynx

habitat in the Kettle Range. The Stickpin fire burned lynx habitat in the Kettle

Range and Bulldog project area in 2015.

217. From 1990-2002 roughly 2,600 square kilometers of lynx habitat burned

in Washington. In 2014 alone, roughly 1,600 square kilometers of lynx habitat in

Washington burned.

218. The Forest Service made changes to the EA for the Bulldog project after

the Bulldog Mountain fire burned the eastern portion of the project area.

219. On April 28, 2022, the Forest Service signed a final decision approving

the Bulldog project.

220. The Bulldog project allows for the logging of old and large trees over 20

inches dbh. Large trees can be logged if they are in campgrounds or 200 feet of open

roads. Large trees can be logged if they are along prescribed fire control features.

Large trees that are between 20 and 25 inches dbh can be logged if they are within

50 feet of large Ponderosa Pine. Large trees between 20 and 25 inches dbh can be

logged if they are within 50 feet of large Western Larch or Douglas Fir and when

prescribed fire is planned for the stand. Large trees between 20 and 25 inches dbh can be logged if they are within 100 feet of aspen clumps.

221. The Bulldog project includes commercial logging within lynx habitat in the Kettle Range. The project includes roughly 7,014 acres of the project area will be subject to commercial logging. The project includes roughly 342 acres of commercial thinning. The project includes roughly 202 acres of "shelterwood removal with reserves." The project includes commercial "regeneration harvests."

222. Commercial logging for the Bulldog project will involve cutting and removing conifer trees 5 inches and larger dbh. Cut trees will be dragged or "yarded" to landing areas using skidders or forwarders and then hauled away by logging trucks. The project includes no requirement for reforestation or replanting after commercial logging. The Forest Service said reforestation or replanting after commercial logging with be "evaluated post-harvest."

223. Commercial logging for the Bulldog project will harm lynx habitat. Commercial logging for the Bulldog project will remove horizontal cover. Commercial logging for the Bulldog project will create unsuitable habitat conditions for lynx.

224. The Bulldog project includes non-commercial logging in lynx habitat in the Kettle Range. Non-commercial logging includes pre-commercial thinning, ladder

fuel reduction, and dead tree felling. Ladder fuel reductions involve cutting the understory trees that are growing under the dripline of an overstory tree.

225. Non-commercial logging for the Bulldog project will harm lynx habitat. Non-commercial logging for the Bulldog project will remove horizontal cover. Non-commercial logging for the Bulldog project will create unsuitable habitat conditions for lynx.

226. The Bulldog project includes prescribed burning in lynx habitat in the Kettle Range. The project includes 8,243 acres of underburning. Underburning involves igniting fuels at a measured pace during predetermined burning conditions. The project includes 2,431 acres of piling and pile burning. Piling and burning involves gathering limbs, tops, and whips and slash and existing woody debris and burning when conditions allow. The project includes 2,441 acres piling and burning within 500 feet of roads. The project includes 1,981 acres of "lop and scatter." These prescriptions will remove horizontal cover. These prescriptions will create unsuitable habitat conditions for lynx.



227. The Bulldog project includes new road work and road building in lynx habitat. The Bulldog project includes building approximately 9 miles of new, temporary roads to access the commercial logging units. The project involves rerouting existing roads.

228. The Bulldog project will be implemented over 10-15 years. In the EA, the Forest Service states that lynx will be displaced from the area during project activities.

61

229. In the EA, the Forest Service states that logging for the Bulldog project will reduce "horizontal cover for lynx" and create an "influx of unsuitable habitat for the next 20-40 years."

230. In the EA, the Forest Service states that logging for the Bulldog project will remove roughly 888 acres early stage forage habitat for snowshoe hares. This treatment will create unsuitable habitat conditions for lynx. This treatment will create unsuitable habitat conditions for 20-40 years.

231. The EA states that the Bulldog project will result in 13 percent of the new U.S. LAU becoming unsuitable lynx habitat.

232. The EA states that 15 percent of the potential denning habitat in the new U.S. LAU is proposed for treatment and will become unsuitable lynx habitat. The EA states that commercial and fuel thinning treatments for the Bulldog project will turn denning habitat into unsuitable habitat for approximately 35-40 years through the reduction in down woody debris.

233. The EA states that there will be deficient habitat connectivity along Albian Hill Road due to the Bulldog project.

234. The EA states the Bulldog project will result in 3,679 acres of unsuitable habitat that will remain unsuitable for up to 40 years.

235. The Forest Service limited its analysis of likely effects to lynx from the Bulldog project to the U.S. LAU. The Forest Service did not consider or analyze effects to lynx in the Indian LAU. The Forest Service restricted in analysis of the likely effects to lynx to the next 40 years. The Forest Service did not consider or analyze the effects to lynx in the Kettle Range "core area" for lynx recovery. The Fish and Wildlife Service did onto consider or analyze the effects to lynx in the Kettle Range "core area" for lynx recovery.

236. The Forest Service determined that the Bulldog project would not have a significant effect on the environment.

237. The Forest Service issued a "finding of no significant impact" for the Bulldog project.

238. The Forest Service never surveyed the project area for lynx or lynx habitat before approving the Bulldog project. The Forest Service never surveyed the project area for lynx or lynx habitat before issuing its finding of no significant impacts.

239. The Forest Service prepared a biological assessment for the Bulldog project.

240. In the biological assessment, the Forest Service determined that Bulldog project "may affect, not likely to adversely affect" lynx. The Forest Service recognized

that the Bulldog project will create unsuitable habitat conditions for lynx over the next 20-40 years but said conditions will improve after that timeframe. The Forest Service said the project is consistent with the forest plan's standards and guidelines. The Forest Service said there are no known lynx "den sites" in the project area.

241. The Forest Service never surveyed the project area for lynx before issuing its "may affect, not likely to adversely affect" determination on lynx. The Forest Service never surveyed for lynx den sites in the project area. The Forest Service never reviewed or consulted the 2017 Lynx Status Assessment before issuing its "may affect, not likely to adversely affect" determination on lynx.

242. The Fish and Wildlife Service concurred with the Forest Service's "may affect, not likely to adversely affect" finding on lynx on two occasions. The Fish and Wildlife first concurred on March 19, 2021, before the Bulldog Mountain fire. After the Bulldog Mountain fire, the Forest Service submitted a new biological assessment to the Fish and Wildlife Service for review of its renewed "may affect, not likely to adversely affect" finding on lynx.

243. The Fish and Wildlife Service provided final concurrence with the Forest Service's "may affect, not likely to adversely affect" finding on lynx on February 7, 2022. The Fish and Wildlife Service's rationale remained the same.

244. The Fish and Wildlife Service never surveyed the project area for lynx before concurring with the Forest Service's "may affect, no likely to adversely affect" finding on lynx.  The Fish and Wildlife Service never reviewed or consulted the 2017 Lynx Status Assessment before concurring on the Forest Service's "may affect, not likely to adversely affect" determination on lynx.

245. Over the past ten years, the Forest Service has approved at least eight other logging projects in the Kettle Range and "core area" for lynx recovery.

246. The Forest Service approved the Orient Watershed project in 2018. The Forest Service approved the Deer-Jasper project in 2014. The Forest Service approved the Kettle Face project in 2011. The Forest Service approved the Walker project in 2012. The Forest Service approved the Sherman Pass project in 2019. The Forest Service approved the Trout Lake project in 2019. The Forest Service approved the Sherman Pass project in 2019. The Forest Service approved the Sanpoil project in 2020. The Forest Service approved the Dollar Mountain project in 2022.



247.  The Forest Service prepared a "five year vegetation management schedule" for the Colville National Forest in 2022.

248. The Forest Service knows which future logging projects, including which project will be authorized under the Bulldog project EA, will be implemented in the Kettle Range over the next five years. The Forest Service knows the acreage to be logged and the harvest volume for each project. The Spike project is proposed for FY 2023 under the Bulldog EA. Jerry project is proposed for FY 2024 under the Bulldog EA.

## FIRST CAUSE OF ACTION
### (Violation of the ESA – arbitrary "not likely to adversely affect" determination)

249. The Kettle Range Conservation Group incorporates all preceding paragraphs.

250. Section 7 of the ESA requires the Forest Service to consult with the Fish and Wildlife Service on how the proposed Bulldog project "may affect" listed species, including threatened lynx. 16 U.S.C. § 1536(a)(2). "May affect" is the appropriate conclusion during consultation when a proposed action may pose *any* effects on listed species.

251. The purpose of Section 7 consultation is to ensure the Forest Service's Bulldog project is not likely to "jeopardize" the continued existence of lynx. 16 U.S.C. § 1536(a)(2). Section 7 of the ESA imposes a substantive duty on the Forest Service to ensure the Bulldog project does not jeopardize the continued existence of listed species, including lynx. *Id.* "Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02

252. Under Section 7 of the ESA, if the Forest Service determines that its authorization of the Bulldog project is "not likely to adversely affect" a listed species and the Fish and Wildlife Service concurs with this finding, then consultation is concluded.

253. The Fish and Wildlife Service explains that a "not likely to adversely affect" determination is only appropriate when the "effects on listed species are expected to be discountable, insignificant, or completely beneficial."

254. Under Section 7 of the ESA, if the Forest Service determines its authorization of the Bulldog project is "likely to adversely affect" a listed species, then the Fish and Wildlife Service must prepare a biological opinion to determine whether the action is likely to jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14.

255. If the Fish and Wildlife Service issues a "no jeopardy" finding in its biological opinion, it must specify reasonable and prudent measures, and terms and conditions, to minimize the impact of any incidental take resulting from the action. 50 C.F.R. § 402.14. The Fish and Wildlife Service must also specify the amount or extent, and effects, of any incidental take that is anticipated by the proposed action. *Id.*

256. The Forest Service prepared a biological assessment for the Bulldog project to evaluate its effect on listed species, including lynx. The Forest Service determined that the project was "not likely to adversely affect" lynx. The Fish and Wildlife Service concurred with the Forest Service's determination that the Bulldog project is "not likely to adversely affect" lynx. The Fish and Wildlife Service's concurrence completed Section 7 consultation for the Bulldog project. The Fish and Wildlife Service's concurrence alleviated the need for the agency to prepare a biological opinion.

257. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to properly evaluate the likely direct, indirect, and cumulative effects of the project on lynx, lynx habitat, connectivity, or lynx recovery.

258. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to properly define and evaluate the effects of the project in the "action area." The "action area" means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." C.F.R. § 402.02

259. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to properly define and evaluate the "environmental baseline." The "environmental baseline" is the condition of listed species before the proposed

action. 50 C.F.R. § 402.02. The baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

260. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to properly define and evaluate the "cumulative effects." Under Section 7, the "cumulative effects" are "those effects of future State or private activities, not involving Federal activities that are reasonably certain to occur within the action area." 50 C.F.R. § 402.02.

261. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to properly define and evaluate the entire "effects of the action," including all aspects of the Bulldog project. The "effects of the action" are all the consequences that are caused by the action on listed species, including the "consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02.

262. When consulting on the Bulldog project, the Forest Service and Fish and Wildlife Service failed to add the "effects of the action" and "cumulative effects" to the "environmental baseline" in order to formulate its opinion about how the

proposed project may affect listed species and whether it will result on a jeopardy finding, as "jeopardy" is defined by the ESA and regulations. 50 C.F.R. § 402.14(g)(4).

263. The Forest Service's determination that the Bulldog project is "not likely to adversely affect" lynx and the Fish and Wildlife Service's concurrence with that determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## SECOND CAUSE OF ACTION
### (Violation of the ESA – best available science)

264. The Kettle Range Conservation Group incorporates all preceding paragraphs.

265. Section 7 of the ESA requires the Forest Service to consult with the Fish and Wildlife Service on how the Bulldog project may affect lynx. 16 U.S.C. § 1536(a)(2). Consultation under Section 7 of the ESA and all related findings and analyses must be based solely on the best scientific and commercial data available ("best available science"). 16 U.S.C. § 1536(a)(2).

266. The Forest Service's biological assessment and related effects analysis and finding that the Bulldog project was "not likely to adversely affect" lynx, and the Fish and Wildlife Service's concurrence with that finding, failed to use and apply the best

available science on lynx, threats to lynx and lynx habitat and connectivity, and recovery of lynx in the Kettle Range "core" recovery area, Washington, and within the lower 48 States.

267. The Forest Service's and the Fish and Wildlife Service's failure to use and apply the best available science when consulting on the Bulldog project is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## THIRD CAUSE OF ACTION
### (Violation of the ESA – irretrievable commitment of resources)

268. The Kettle Range Conservation Group incorporates all preceding paragraphs.

269. Section 7(d) of the ESA prohibits the Forest Service from making any "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would not violation Section 7(a)(2)'s duty to conserve obligation. 16 U.S.C. § 1536(d).

270. In May, 2023, the Forest Service informed the Kettle Range Conservation Group that it was reinitiating consultation on lynx for the Bulldog project in response to the organization's sixty-day notice of alleged violations. The

Forest Service said it would prepare a new biological assessment and consult with the Fish and Wildlife Service (which would result in either a new letter of concurrence or a biological opinion). The Forest Service did not commit to a final completion date.

271. During the new consultation period, the Forest Service said it would not stop implementing the Bulldog project, including engaging in logging activity or related road work or suspend putting projects out for bid pending completion of new consultation on lynx.

272. The Forest Service's decision to continue implementing the Bulldog project while new consultation on lynx is still on-going and pending is a violation of Section 7(d) and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## FOURTH CAUSE OF ACTION
### (Violation of the ESA – 2020 change to LAUs in Kettle Range)

273. The Kettle Range Conservation Group incorporates all preceding paragraphs.

274. Section 7 of the ESA requires the Forest Service to consult with the Fish and Wildlife Service when it takes actions that "may affect" listed species, including

threatened lynx. 16 U.S.C. § 1536(a)(2). "May affect" is the appropriate conclusion during consultation when a proposed action may pose *any* effects on listed species.

275. In 2020, the Forest Service took "agency action" that may affect lynx by changing LAUs and removing habitat from the LAUs in the Kettle Range and project area. The Forest Service removed some areas from LAUs. The Forest Service combined LAUs in some areas. The Forest Service removed areas of the lynx "core recovery zone" from LAUs. The Forest Service only manages for lynx in LAUs. The Forest Service only analyzes effects to lynx in LAUs. The Forest Service's forest plan components designed to conserve lynx are premised on LAUs. The Forest Service does not manage lands outside LAUs for lynx or lynx habitat.

276. The Forest Service's 2020 decision to change the LAUs "may affect" lynx, lynx habitat, and lynx recovery in the Kettle Range, lynx recovery zone and "core" area, and the project area.

277. When the Forest Service decided to change the LAUs boundaries in 2020, including removing certain areas from the LAUs, combining LAUs, and removing lynx habitat and "core areas" for lynx recovery from LAUs in the Kettle Range and project area, the agency never initiated and completed consultation with the Fish and Wildlife Service as required by Section 7 of the ESA.

278. The Forest Service's failure to initiate and complete consultation on its decision to make changes to the LAUs in the Kettle Range in 2020 is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## FIFTH CAUSE OF ACTION
### (Violation of NEPA – 2020 change to LAUs in Colville National Forest)

279. The Kettle Range Conservation Group incorporates all preceding paragraphs.

280. NEPA requires the Forest Service to adequately disclose, consider, and analyze the direct, indirect, and cumulative effects of its proposed actions. 42 U.S.C. § 4332 (C); 40 C.F.R. § 1502.16. The Forest Service must take a "hard look" at the effects of the action.

281. Direct effects are caused by the action and occur at the same time and place. Indirect effects are caused by the action and occur later in time or farther removed in distance, but are reasonably foreseeable. Cumulative effects are the impacts on the environment that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

75

282. NEPA requires the Forest Service to submit proposed actions for public review and comment.

283. The Forest Service never analyzed the direct, indirect, or cumulative effects of its 2020 decision to change the LAUs or why and how it made changes to LAUs in the Colville National Forest, Okanogan Highlands, Kettle Range (including but not limited to the project area), and Selkirks. The Forest Service never submitted its proposal or decision to change the LAUs in 2020 for public review and comment.

284. The Forest Service's failure analyze the direct, indirect, or cumulative effects of its decision to change the LAU boundaries or provide the public the opportunity to review and comment on such changes as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## SIXTH CAUSE OF ACTION
### (Violation of NEPA – effects of Bulldog project)

285. The Kettle Range Conservation Group incorporates all preceding paragraphs.

286. NEPA requires the Forest Service to adequately disclose, consider, and analyze the direct, indirect, and cumulative effects of its proposed actions. 42 U.S.C.

§ 4332 (C); 40 C.F.R. § 1502.16. The Forest Service must take a "hard look" at the effects of the action.

287. The Forest Service's EA for the Bulldog project fails to adequately analyze the direct, indirect, and/or cumulative effects on lynx, lynx habitat, connectivity, or lynx recovery in the project area, the Kettle Range "core" area, Washington, or the lower 48 States.

288. The Forest Service never considered the synergistic or combined effects to lynx from other logging projects in the area, the elimination of Eastside Screens (and the 21-inch rule) from the Colville forest plan, changes to LAU boundaries, wildfires and related work to combat and restore areas burned (including the project area), insect outbreaks, climate change, loss of connectivity and habitat fragmentation, human intrusions into lynx habitat, mortality, winter recreation and trail grooming, livestock grazing, and other threats to lynx.

289. The Forest Service's failure to analyze the direct, indirect, and cumulative effects to lynx, lynx habitat, connectivity and lynx recovery is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## SEVENTH CAUSE OF ACTION
### (Violation of NEPA – EIS required)

290. The Kettle Range Conservation Group incorporates all preceding paragraphs.

291. NEPA requires the Forest Service to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

292. In deciding whether or not to prepare an EIS for the Bulldog project, the Forest Service used and relied on the pre-2020 NEPA regulations, 40 C.F.R. § 1508.27.

293. In deciding whether or not to prepare an EIS, the Forest Service must consider both the context and intensity of the proposed action. 40 C.F.R. § 1508.27. Context refers to the scope of the proposed action, including the interests affected. 40 C.F.R. § 1508.27(a). Assessing context requires that an action be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality, with both short- and long-term effects being relevant.

294. Intensity refers to the severity of the impact, and requires consideration of a number of factors, including: beneficial and adverse impacts; the degree to which the proposal affects public health and safety; unique characteristics of the

geographic area, such as proximity to ecologically critical areas and cultural resources; the degree to which effects are likely to be controversial, highly uncertain, or involve unique or unknown risks; the precedential nature of the action; whether the action is related to other actions with cumulatively significant impacts; and the degree of adverse effects on species listed as endangered or threatened under the ESA. 40 C.F.R. § 1508.27(b).

295.  The Bulldog project has the potential to significantly affect public health or safety.

296. The Bulldog project will occur in an ecologically critical area, including the Kettle Range "core" area for lynx recovery which is one of the few remaining areas in the lower 48 States occupied by lynx. The project area is unique and essential to the conservation of lynx in the Kettle Range, Washington, and lower 48 States. The Bulldog project is within WDFW's lynx management zone and LAUs. The Bulldog project is in the Kettle Range, where efforts are underway to recover and reintroduce lynx.

297. The Bulldog project will occur in special management areas important for wildlife, including lynx. The Bulldog project will occur in Inventoried Roadless Areas.

298. The effects of the Bulldog project on lynx, lynx habitat and connectivity, and recovery in the Kettle Range, Washington, and lower 48 States are highly controversial, highly uncertain, and involve unique and unknown risks (given the lack of data and analysis presented in the EA or obtained by the Forest Service). The changes made to the LAUs boundaries – for the Bulldog project - are highly controversial, uncertain, and involve unknown risks.

299. The purpose and need of the Bulldog project, including how the Forest Service defines the "historic range of variability" for the Kettle Range and project area and its prescriptions to achieve this "historic range of variability" are highly controversial and uncertain. The best available science reveals the Forest Service is mischaracterizing the "historic range of variability" in the project area and Kettle Range. The best available science reveals the Forest Service's Bulldog project will move the forest away from "historic range of variability" and away from suitable habitat conditions for lynx (which historically occupied the area in large numbers).

300. The Forest Service's decision to abandon the Eastside Screens and allow for the logging of old and large trees over 21 inches dba is highly controversial, highly uncertain, and involves unique and unknown risks (given the potential impacts to mature and old growth forest habitats relied on by a variety of species, including lynx). Cutting mature, old growth trees over 21 inches dbh represents a

significant change and departure from the Forest Service's previous 1995 21-inch rule prohibiting such logging of large trees in order protect mature, old growth habitat and biodiversity for various species, including lynx.

301. The Bulldog project will have cumulatively significant impacts on lynx, lynx habitat, connectivity, and recovery efforts in the Kettle Range, especially when evaluated in the context of other threats to the species, including climate change, winter recreation and grooming, human-caused mortality, and loss of habitat from logging, fire, and insects.

302. The Bulldog project sets a dangerous precedent for how logging projects like this are conducted in the Kettle Range, an area important to and essential for lynx conservation.

303. In deciding not to prepare an EIS, the Forest Service failed to adequately consider and evaluate the significance factors.

304. The Forest Service's failure and/or decision not to prepare an EIS is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## EIGHTH CAUSE OF ACTION
### (Violation of the NFMA – lynx habitat)

305. The Kettle Range Conservation Group incorporates all preceding paragraphs.

306. NFMA directs that all site-specific projects be consistent with the forest plan. 16 U.S.C. § 1604(i).

307. The 2019 Colville forest plan includes a number of forest plan components (i.e., desired conditions, objectives, standards, and guidelines) to ensure sufficient and adequate lynx habitat remains in the Kettle Range. Most of these forest plan components rely on LAU boundaries.

308. The forest plan states that all forest plan management direction will be consistent with "existing recovery plans" for federally listed species, including lynx.

309. The forest plan states that the Forest Service should ensure habitat conditions in the Kettle Range contribute to the recovery of federally listed species, including lynx (FW-DC-WL-02).

310. The forest plan states that habitat conditions for threatened species (including lynx), including the amount, distribution and connectivity of habitat on the forest, are to be consistent with the historic range of variability (FW-DC-WL-02).

311. The forest plan states that forest successional stages within LAUs will provide a mosaic of lynx habitat (including foraging, travel, and denning) with a

landscape pattern that is consistent with the historic range of variability (FW-DC-WL-04).

312. The forest plan states that during the expected 15 years of forest plan implementation, it will aim to restore an average of a 100 acres per year of snowshoe hare and/or lynx habitat within LAUs in the Kettle Range (FW-OBJ-WL-02).

313. The forest plan states that projects shall not reduce horizontal cover (snowshoe hare habitat) in late-closed structure subalpine fir/lodgepole or spruce/subalpine fir forests in the Kettle Range, unless certain exceptions are met (FW-STD-WL-02). The forest plan states that LAUs must be used to measure changes to lynx habitat.

314. The forest plan states that the Forest Service cannot change more than 15 percent of lynx habitat within any single LAU to an unsuitable condition in the Kettle Range in any 10-year period (FW-STD-WL-03).

315. The forest plan states that, subject to some exceptions, there can be no net increase in groomed or designated over-the-snow routes into lynx habitat at the LAU scale in the Kettle Range (FW-STD-WL-O4).

316. The forest plan states that when conducting vegetation management of coniferous vegetation in the Kettle Range, the suitability of lynx habitat with a LAU

shall not be reduced below 70 percent of the area that is capable of providing

suitable lynx habitat (subalpine fir-associated forest types) (FW-STD-WL-05).

317. The forest plan states that a minimum of 20 percent of "untreated

patches" and tree stem densities not less than 500 trees per acre in early structure

vegetation types must be maintained within LAUs in the Kettle Range (FW-STD-

WL-06).

318. The forest plan states vegetation management activities in LAUs in the

Kettle Range should be focused in areas of poor snowshoe hare habitat (FW-GDL-

WL-05).

319. The forest plan states that habitat for alternative prey species for lynx,

primarily red squirrel, should be available in each LAU in the Kettle Range by

providing cone-bearing late, closed structure conifer forest with coarse woody debris

and snags and downed wood (FW-GDL-WL-06).

320. The forest plan states that the expansion or new construction of

recreation and administrative facilities within LAUs in the Kettle Range should be

located in, or adjacent to, existing areas of development, rather than creating new

developed recreation or administrative sites (FW-GDL-WL-07).

321. The forest plan states that road reconstruction that results in increased

traffic speed and volume should be avoided within LAUs in the Kettle Range and

that new permanent roads should not be located on forested ridge tops, saddles, close to forest stringers, or in other areas important for habitat connectivity in the Kettle Range (FW-GDL-WL-08).

322. The forest plan states that large, permanent openings should not be created in prey habitat within LAUs in the Kettle Range to contribute to habitat connectivity (FW-GDL-WL-09).

323. In approving the Bulldog project, the Forest Service failed to analyze, discuss, and demonstrate compliance with these forest plan components for lynx.

324. The Forest Service's 2020 changes to the LAUs in the Colville National Forest, Kettle Range, and Bulldog project area made it impossible to analyze and evaluate and demonstrate compliance with forest plan components for lynx. The Forest Service avoided compliance with forest plan components for lynx by changing the LAU boundaries, removing areas from the LAUs, and/or combining LAUs.

325. The Forest Service's failure to analyze, demonstrate and ensure compliance with forest plan components for lynx and lynx habitat is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

326. The Forest Service's approval of the Bulldog project is inconsistent with forest plan components for lynx. The Bulldog project violates forest plan standards and guidelines for lynx and lynx habitat.

327. The Forest Service's decision to change the LAUs in 2020 is inconsistent with forest plan components for lynx and violates forest plan standards and guidelines for lynx and lynx habitat.

328. The Forest Service failure to comply with forest plan standards and guidelines for lynx and lynx habitat is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706(1).

## REQUEST FOR RELIEF

WHEREFORE, the Kettle Range Conservation Group respectfully request that this Court:

A.  Declare the Forest Service violated and continues to violate the ESA, NFMA, and NEPA as alleged above;

B. Declare the Fish and Wildlife Service violated and continues to violate the ESA as alleged above;

C.  Vacate the Forest Service's decision, related EA and biological assessment, and any decisions, actions, permits or contracts implementing the portions of the

Bulldog project challenged in this case, as well as the 2020 changes made to the LAUs, pending compliance with the law;

D.  Vacate the Fish and Wildlife Service's concurrence on the Forest Service's "not likely to adversely affect" finding for lynx;

E.  Remand this matter back to the Forest Service and the Fish and Wildlife Service with instructions to comply with NEPA, NFMA and the ESA, as outlined herein and by this Court, including: (1) completion of new NEPA analysis analyzing the direct, indirect, and cumulative effects to lynx, preparation of an EIS, and completion of new, formal Section 7 consultation and the issuance of a biological opinion for the Bulldog project; and (2) completion of a NEPA analysis and Section 7 consultation on changes the LAUs (as alleged above);

F.  Award the Kettle Range Conservation Group their reasonable attorneys' fees, costs and expenses of litigation pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g) and/or the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412;

G. Issue any other relief, including preliminary or permanent injunctive relief, that the Kettle Range Conservation Group may subsequently request;

H.  Issue any other relief this Court deems necessary, just, or proper.

Respectfully submitted this 23rd day of August, 2023.

*/s/ Sadie July Normoyle*
Sadie J. Normoyle (Washington Bar No. 57811)
Western Environmental Law Center
P.O. Box 6087
Beaverton, OR 97007
(971) 285-3632
sadiejn@westernlaw.org

*/s/ Matthew K. Bishop*
Matthew K. Bishop (Mont. Bar No. 9968), *admitted PHV*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org

*Counsel for Plaintiff, Kettle Range Conservation Group*